# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>146 Split Rail Road, Carthage, NC 28327, to include any<br>outbuildings located on the property | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 1:25MJ__315__ |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession With Intent to Distribute Controlled Substances |
| 21 U.S.C. § 856(a) | Maintaining a Drug Involved Premises |
| 21 U.S.C. § 960(a)(1) and 963 | Attempted Importation of a Controlled Substance |

The application is based on these facts:

See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/S/ Jordan Wicks
_____
*Applicant's signature*

Jordan Wicks, Inspector
_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 8/11/2025

Judge's signature

City and state: Winston-Salem, North Carolina

Joi Elizabeth Peake, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF APPLICATION FOR**</u>
<u>**SEARCH AND SEIZURE WARRANT**</u>

I, Jordan Wicks, being duly sworn, depose and state:

## I.   <u>INTRODUCTION</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **146 Split Rail Road, Carthage, North Carolina 28327** ("**Target Location**"), to include all outbuildings and a gray 2007 Pontiac, NC License Plate: TPT9437 located on the property at the time of execution, further described below and depicted in Attachment A, for the things described in Attachment B.

2.      I am a U.S. Postal Inspector and have been so employed since 2018. I am currently assigned as the USPIS Drug Task Force Supervisor in Fayetteville, North Carolina. I am additionally a Task Force Agent for the Drug Enforcement ("DEA") Wilmington Resident Office. I am responsible for the investigation of narcotics, drug trafficking organizations, and money laundering. I have received training by the United States Postal Inspection Service, and members of the USPIS, in the investigation of controlled substances or proceeds/payments being transported through the United States. From 2014 to 2018, I was employed as a Special Agent with the United States Army Criminal Investigation Division (CID) as a supervisor in the Special Victims Unit. From 2008 to 2014, I was employed as a Detective with the Maplewood Police Department, St. Louis County, Missouri. From 2006 to 2008, I was employed as a Narcotics Detective with the Lincoln County Sheriff's Office, Missouri. From 2001 to 2005, I was a member of Security Forces in the United States Air Force. I have experience and advanced training pertaining to drug related investigations from the USPIS, DEA, U.S. Army, International Narcotics Interdiction Association, Midwest Counterdrug Training Academy, Missouri Narcotic Officers Association, the

Multijurisdictional Counterdrug Task Force, as well as various other federal agencies and organizations.

3.    I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of defendants and witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, the use of undercover agents, the use of confidential sources, and the use of court-authorized wire intercepts. Based upon my training, experience, and understanding of this investigation, I believe that individuals engaged in drug trafficking and money laundering often keep and maintain certain evidence of their crimes in their respective residences, to include those items set forth in Attachment B. I additionally believe documents, records, wireless telephones, tablets, and other digital media containing evidence, fruits, and instrumentalities linked to illegal drug trafficking activities will be discovered within the **Target Location.**

4.    Among other duties, I am now participating in an investigation relating to violations and attempted violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of methamphetamine, fentanyl, ketamine, and MDMA, possession with the intent to distribute controlled substances, and conspiracy to do the same), Title 21, United States Code, Section 856 (maintaining a drug involved premises), and Title 21, United States Code, Sections 960(a) (1) and 963 (attempted importation of a controlled substance).

5.    The statements in this affidavit are based in part on my own investigation, as well as information provided by other law enforcement officials, and on my experience, training and background. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

II.    **<u>LOCATION TO BE SEARCHED</u>**

2

6.      This affidavit is submitted in support of an application for the issuance of a search warrant for the premises of the **Target Location**, to include all outbuildings and a gray 2007 Pontiac, NC License Plate TPT9437. located on the property at the time of execution. The **Target Location** is modular home located on a grey foundation. The **Target Location** has light colored siding with dark colored shutters and a covered wood porch. The front door of the residence faces to the approximate southwest and the numbers "146" are clearly posted on the porch. A photograph of the **Target Location** is attached hereto as Attachment A.

## III.    CONDUCT OR CHARACTERISTICS COMMON TO INDIVIDUALS ENGAGED IN DRUG TRAFFICKING

7.      Unless otherwise stated, the information in this affidavit is either personally known to me or has been provided to me by other law enforcement officers assigned to this investigation. Some of those officers have developed advanced expertise in the review and analysis of financial information, including the analysis of bank records and monetary instruments. These law enforcement officers have extensive experience in debriefing defendants, witnesses, informants, and other persons who have had personal experience and knowledge of collecting, spending, converting, transporting, distributing, and concealing proceeds of illegal activities, including drug trafficking. Based upon information conveyed to me by these officers who have developed financial expertise and my own experience, I know there are characteristics common to individuals who engage in drug trafficking and money laundering, namely:

a.   That drug traffickers normally possess firearms, cellular telephones, U.S. currency and other items in furtherance of drug trafficking.

b.   That drug traffickers must maintain large amounts of United States currency on hand in order to maintain and finance their ongoing drug business. That drug

3

traffickers have safes or lock boxes, to conceal, secure, and store controlled substances, United States currency, and firearms.

c. That drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement.

d. That even though these assets are in other persons' names, drug traffickers continue to use these assets and exercise control over them.

e. That drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives, digital devices, electronic devices, routers, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

f. That these aforementioned books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, digital devices, electronic devices, routers, money orders and other papers are readily available to the drug traffickers such as in their residences, vehicles, electronic storage devices, places of business and/or alternate storage locations, for example, mini storage facilities.

g. That it is common for drug traffickers to keep packaging material and drug paraphernalia for packaging, diluting, weighing, and distributing illegal drugs. These paraphernalia items include, but are not limited to, scales, plastic bags, and diluting agents.

4

Case 1:25-mj-00315-JEP    Document 1    Filed 08/11/25    Page 5 of 26

h. That persons involved in drug trafficking conceal in secure locations, with ease of access, large amounts of currency and other proceeds of drug transactions, and financial instruments and other evidence of financial transactions relating to the obtaining, transferring, secreting, and spending of drug transaction proceeds.

i. That when drug traffickers amass large amounts of money from narcotics trafficking, they attempt to hide the illegal origin of the money. It is common for drug dealers to conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

j. Further, individuals who amass proceeds from illegal activities, including drug trafficking, routinely attempt to further that conduct and/or conceal the existence and source of their funds. I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts. They maintain records of these transactions in their residence or other buildings under their control. The methods they use include cash purchases, the purchasing of monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities, and the use of foreign travel and "offshore"

5

banking in an attempt to break a financial paper trail. These and other schemes involving the movement and concealment of criminal proceeds are commonly referred to as "money laundering."

k. That drug traffickers frequently use a continuing pattern of activities to launder and conceal drug-generated proceeds and assets, which lasts over a period of years. Drug traffickers use these patterns or schemes to create the appearance of legitimate income so that they can eventually transfer the proceeds or assets to themselves or to a nominee under their control. In this way, traffickers can enjoy and use the proceeds while attempting to conceal their illegal activities, which generated the proceeds or assets.

l. That individuals normally maintain records of their financial activity in their residence, including receipts for expenditures by cash and check, bank records, and other financial documents. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business and often use accountants to complete financial statements and tax returns for their business and personal returns.

m. That it is common for individuals who are running businesses (whether lawful businesses, wholly illicit businesses, or lawful businesses which commit unlawful activities related thereto) to maintain records related to the businesses and their activities including, but not limited to, the following:

    i. Customer files and lists related to the services or product provided;

    ii. Records and/or documents memorializing the sale/distribution of their product or the providing of services;

6

iii. Records and/or documents provided to customers in connection with the services or product;

iv. Correspondence to and/or from actual or prospective customers;

v. Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business;

vi. Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services;

vii. Personnel and payroll/commission records for all employees that appear to be engaged in the business;

viii. Business or personal records related to the receipt, transfer and expenditure of income received from the business;

ix. Bank records, credit card account records, brokerage account records, investment records, financial institution records and any other records reflecting the receipt of income, transfer of assets or expenditure of income produced by the business; and

x. Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence, memoranda, directives, and organizational charts.

n. That persons engaged in money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal activity over a long period of time.

7

Case 1:25-mj-00315-JEP    Document 1    Filed 08/11/25    Page 8 of 26

o. That courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, that includes trafficking in controlled substances and illegal schemes to conceal drug-generated proceeds.

p. Fentanyl, methamphetamine, MDMA, and ketamine, are not commonly manufactured within North Carolina. It is common for drug traffickers to travel to major distribution centers to purchase drugs and/or to arrange for its distribution elsewhere in the United States. After purchasing drugs, these drug traffickers will transport or cause to be transported, drugs to the areas in which they will distribute the drugs. The methods of transportation include commercial airlines, commercial vessels, private aircraft, rental automobiles, private automobiles, and other such means of transportation.

q. That drug traffickers commonly keep and maintain records of their travels in locations for easy access such as their residences, cell phones, vehicles, places of business, and mini-storage facilities.

r. That drug traffickers commonly maintain addresses or telephone numbers, in books or papers, that reflect names, addresses, and/or telephone numbers for associates in the trafficking organization, and keep these records in their residences, electronic storage devices, places of business, and mini-storage facilities.

s. That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs, and that they usually keep these photographs in their residences, places of business, and mini-storage facilities with other drug related documents.

8

t.  That persons engaged in drug trafficking and money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

u.  Evidence of occupancy and residence including, but not limited to, utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in drug prosecutions.

v.  That individuals utilize computers to conduct illegal activities, and that computers can contain stored data related to these activities that can be retrieved even when individuals attempt to delete the data (*i.e.*, internet activities, emails, business records, photo and video storage and document creation and storage).

w.  That persons engaged in drug trafficking and money laundering frequently communicate about their activities via text message and email on personal computers and cellular telephones. Based on my training and experience, records of such communications can be found stored electronically on computers and cellular telephones for a long period of time. Furthermore, such personal computers and cellphones are maintained or kept on the persons, or in the personal residence, of the persons engaged in fraud and/or money laundering.

x.  That persons engaged in drug trafficking and money laundering often possess firearms and firearm accessories in their residence or vehicle in order to protect their controlled substances or currency representing drug proceeds.

Case 1:25-mj-00315-JEP    Document 1    Filed 08/11/25    Page 10 of 26

## IV. OVERVIEW OF INVESTIGATION

8. The United States, including the USPIS, Homeland Security Investigations ("HSI"), and DEA, are investigating a drug distributor operating within the Middle and Eastern Districts of North Carolina. The investigation to date has identified Pachomow as the suspected distributor of these drugs, which includes methamphetamine, fentanyl, 3, 4-Methylenedioxymethamphetamine ("MDMA"), and ketamine. This investigation has established evidence that Pachomow is engaged in a conspiracy to obtain and distribute methamphetamine, fentanyl, MDMA, and ketamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Additionally, it has established that Pachomow has attempted to import MDMA in violation of Title 21, United States Code, Sections 960(a)(1) and 963 and that the Target Location is a drug involved premises in violation of Title 21, United States Code, Section 856. This includes the illegal importation of controlled substances that were seized in transit to 146 Split Rail Road, Carthage, North Carolina 28327 (**Target Location**).

## V. PROBABLE CAUSE

9. On November 27, 2024, UPS package 1ZDP300T5420024414 was interdicted by German Customs in Koln, Germany. The package was in transit from the Netherlands to the **Target Location**. The package listed the recipient as Janusz Pachomow at the **Target Location**. The UPS package was listed as containing a "Central Heating Boiler."

10. A search of the package led to the discovery of approximately 7 kilograms of MDMA pills stamped with the impression of President Donald Trump and Homer Simpson. MDMA is a Schedule I controlled substance under the Controlled Substances Act. The USPIS Forensic Laboratory later confirmed the total weight of all the tablets was 6939 grams and confirmed the substance to be MDMA. After interdicting the package, German Customs notified

10

HSI Frankfurt, Germany, of the seizure. HSI confirmed at least four prior international shipments had been sent to 146 Split Rail Road with the description of "Central Heating Boiler."

11.    On February 27, 2025, the Aberdeen Police Department (APD) responded to a Walmart located at 250 Turner Street, Aberdeen, NC 28315. Walmart had received multiple pieces of first-class mail returned for various reasons, including no postage being paid, insufficient address, and/or being undeliverable. When returned, Walmart employees opened the mail to see what they contained and found what they suspected to be controlled substances. Walmart confirmed that they did not mail the pieces of mail. The envelopes and drugs were seized by APD and processed as evidence.

12.    On March 7, 2025, APD was again dispatched to the same Walmart for related mailings. Walmart had received multiple other pieces of first-class mail that again showed Walmart as the sender. These envelopes were also found to contain suspected controlled substances. Walmart confirmed that they did not mail the pieces of mail, either. The envelopes and drugs were seized by APD and processed as evidence.

13.    On March 27, 2025, I met with members of the APD regarding these mailings. I conducted a review of the envelopes and noted the sender's information on each envelope was typed/printed on a label that was then affixed to each individual envelope. Each envelope had the sender's address of "SuperCenter 250 Turner St Aberdeen, NC 238315" attached on the back side of the envelopes. The sender's address was also typed/printed and then affixed to the envelope. I seized the envelopes as evidence and submitted them to the USPIS Forensic Laboratory Services for further processing.

14.    I reviewed the drugs seized from within each envelope. My inspection of those items included multiple plastic bags with white powder, plastic bags with white pills, and one

11

which contained M30 fentanyl pills. I conducted a field test of the white powder substances using a TruNarc. A TruNarc is a handheld device that rapidly detects and identifies controlled substances. In this instance, the TruNarc identified the white powder substance as ketamine. One of the envelopes found to contain ketamine was mailed to 5854 Michelle Drive, Wilmington, NC 28403.

15. Only one of the Walmart envelopes confirmed to contain drugs was sent registered mail and assigned a tracking number: 9589 0710 5270 1858 8595 33. This envelope was found to contain a substance that field tested positive for ketamine. I reviewed USPS business records and confirmed it was mailed from the Lakeview Post Office, processed through the Eastern District of North Carolina, and then later returned to the Walmart in the Middle District of North Carolina.

16. I was able to confirm this piece of registered mail was paid for with a credit card. I conducted a review of USPS business records to determine other mailings paid for with this same credit card. In total, I identified 17 separate mailings to date. Specifically, from September 2024 to March 2025, 14 items were sent through the Lakeview Post Office. In March 2025, 2 mailings were paid for and sent at the Vass Post Office. In April 2025, 1 package was paid for at the Pinebluff Post Office.

17. I know through my training and experience in conducting drug related investigations that those who use the U.S. Mail to distribute drugs will routinely use multiple post offices and/or collection boxes to send the packages and first-class mail from to evade law enforcement detection.

18. On April 7, 2025, I responded to the Aberdeen Post Office after being notified of a possible related mailing being returned to Walmart. I conducted a review of the envelope and confirmed the sender was listed as "SuperCenter 120 Turner St. Aberdeen, NC 28315." The

12

Honorable United States Magistrate Judge Joe. L. Webster later issued a search warrant (1:25MJ119-1) for this envelope and it was found to contain a white powder substance. The USPIS Forensic Laboratory later confirmed this substance to be ketamine hydrochloride.

19. On April 8, 2025, I spoke with a Latent Print Analyst at the USPIS Forensic Laboratory regarding the submitted evidence. Multiple latent fingerprints were recovered from the envelopes submitted for analysis. Those fingerprints matched fingerprints on record from Janusz S. Pachomow, FBI number: 988324XA5.

20. Based on that information, I reviewed information maintained on Pachomow on various official databases. A review of his criminal history showed that Pachomow has an extensive history with drugs, including multiple felony drug convictions in New Jersey and Virginia. Pachomow is currently on state probation for drug offenses. The database review also indicated Pachomow is illegally residing within the United States. He received a final order of removal issued in 2022. This information led to the initial contact with HSI, subsequently identifying the seizure that occurred in Germany in November 2024.

21. I conducted a review of law enforcement records and USPS business records which reflect Pachomow resides at the **Target Location**. USPS business records confirm a large number of packages are being delivered to the **Target Location** in Pachomow's name. This includes packages mailed from California, Arizona, and Texas, known narcotic source states. I confirmed that a large number of packages mailed to Pachomow at the **Target Location** were being SMS tracked by phone number (201) 558-8638[1], including packages mailed from Europe. I confirmed with HSI that one of these international packages tracked was seized and is reported to have contained drugs, although the specific drugs are not known at the time of this affidavit.

---

[1] On April 14, 2025, the Honorable United States Magistrate Judge Joe. L. Webster issued a tracking warrant (1:25MJ129-1) to monitor the geo-location of this device.

22. On April 17, 2025, members of the USPIS and the Moore County Sheriff's Office (MCSO) were conducting surveillance of the **Target Location**. A gray 2007 Pontiac, NC License Plate: TPT9437[2], was observed parked at the **Target Location**. The Pontiac is registered to Lile Pachomowa [sic], the suspected mother of Pachomow, at the **Target Location**. At approximately 2:54 p.m., Pachomow and an elderly female were observed departing the **Target Location** in the Pontiac. The investigative team followed the Pontiac to the Lakeview Post Office, 278 Camp Easter Road, Lakeview, NC 28350. Pachomow was observed exiting the vehicle and placing multiple envelopes within the blue USPS collection box. I conducted a review of what was mailed, and 7 white envelopes were identified with Jug Grips, 35 Highland View Drive, Southern Pines, NC 28387, listed as the sender's address. At the time of this affidavit, Pachomow has no known employment or connection to Jug Grips [3]. I removed two of these envelopes from the mail stream for further examination. The investigative team followed the Pontiac back to the **Target Location** after the envelopes were mailed.

23. On April 18, 2025, the Honorable United States Magistrate Judge Joe L. Webster issued search warrants (1:25MJ143-1 and 1:25MJ144-1) for the two envelopes seized the day prior. Both envelopes were found to contain white pills that were submitted to the USPIS Forensic Laboratory for testing. The laboratory identified the white pills as phenazolam, which is not currently listed as a scheduled controlled substance.

24. On April 28, 2025, I was contacted by LT J. Brown, MCSO, regarding multiple pieces of mail that had been returned to Jug Grips, 35 Highland View Drive, Southern Pines, NC

---

[2] Your affiant incorrectly listed this license plate as "PT9437" in the affidavits for 1:25MJ143-1, 1:25MJ144-1, 1:25MJ157-1, 1:25MJ158-1, 1:25MJ159-1, and 1:25MJ160-1. However, it was properly listed that the vehicle was registered to the Target Location.

[3] JugGrips is a product designed to help remove lids on containers with smooth surfaces and is run out of a private residence located at 35 Highland View Drive, Southern Pines, NC 28387.

Case 1:25-mj-00315-JEP    Document 1    Filed 08/11/25    Page 15 of 26

28387.  The owner of Jug Grips found that the envelopes contained suspected drugs, so he contacted the MCSO.  LT Brown confirmed one of the envelopes, addressed to a person in Virginia, contained suspected M30 fentanyl pills.  The USPIS Forensic Laboratory confirmed the pills contained carfentanil, an extremely potent synthetic opioid and fentanyl analog.  The recipient's information on the second envelope was covered with a postage due sticker, however, this envelope was found to contain a substance that field tested positive for the presence of methamphetamine.  The USPIS Forensic Laboratory confirmed this substance to be d-methamphetamine hydrochloride with 98% purity.

25.     On April 28, 2025, I contacted a supervisor at the Aberdeen Post Office.  The USPS employee confirmed that four envelopes had been returned that were addressed from Jug Grips. The four envelopes were seized by me, and I later applied for search warrants for each.

26.     On April 30, 2025, the Honorable United States Magistrate Judge Joe L. Webster issued search warrants (1:25MJ157-1, 1:25MJ158-1, 1:25MJ159-1, and 1:25MJ160-1) for the four envelopes.  One envelope was found to contain four plastic bags of white pills, confirmed by the USPIS Forensic Laboratory to contain phenazolam.  The second contained blue M30 fentanyl pills, confirmed by the USPIS Forensic Laboratory to contain fentanyl.  The third contained white pills, confirmed by the USPS Forensic Laboratory to contain phenazolam.  The fourth contained a white powder substance that the USPIS Forensic Laboratory found to contain caffeine.  The USPIS Forensic Laboratory identified one latent fingerprint belonging to Pachomow on the exterior of the fourth envelope containing caffeine.

27.     On April 29, 2025, members of the USPIS and the NC Counterdrug Program conducted surveillance of the **Target Location**.  At approximately 1:45 p.m., Pachomow was observed leaving the **Target Location** with an elderly female, believed to be his mother, identified

15

as Lile Pachomowa [sic]. Pachomow departed the **Target Location** in the previously identified Pontiac, registered to the **Target Location**. I followed the Pontiac as it traveled to the Lakeview Post Office. I observed Pachomow exit the passenger side of the vehicle carrying multiple pieces of mail and enter the Lakeview Post Office. Pachomow left shortly thereafter and had nothing in his hands. The Pontiac was then followed back to the **Target Location** and Pachomow was observed entering the **Target Location**.

28. After Pachomow returned to the **Target Location**, I conducted a review of what he mailed from the Lakeview Post Office. Ten envelopes were identified, all of which were addressed from Jug Grips, 35 Highland View Drive, Southern Pines, NC 28387. These envelopes were sent to various locations in Florida, Tennessee, Pennsylvania, West Virginia, Colorado, Indiana, Massachusetts, California, and New Hampshire.

29. On April 30, 2025, members of the NC Counterdrug Program and the MCSO conducted surveillance on the **Target Location**. At approximately 2:30 p.m., Pachomow, and the person believed to be his mother, departed the **Target Location** in the Pontiac. The Pontiac was followed to the Lakeview Post Office and Pachomow was observed entering the post office with multiple pieces of mail. Pachomow was observed exiting the post office empty handed and departed the area. The Pontiac was followed to the Exxon Gas Station, 4396 US-1, Lakeview, NC 28350. After refueling, the Pontiac was followed back to the **Target Location**.

30. After Pachomow returned to the residence, a review of what he mailed was conducted at the Lakeview Post Office. Nine envelopes were found to have been mailed, all of which were listed as being mailed from Jug Grips, 35 Highland View Drive, Southern Pines, NC 28387. The envelopes were sent to various locations in Florida, Illinois, Georgia, New Hampshire, New York, Kansas, Virginia, and South Carolina.

Case 1:25-mj-00315-JEP    Document 1    Filed 08/11/25    Page 17 of 26

31. On May 1, 2025, I traveled to the Lakeview Post Office and conducted a review of the mail. Upon doing so, I identified seven pieces of mail addressed from Jug Grips, 35 Highland View Drive, Southern Pines, NC 28387. These envelopes were mailed to Nevada, New York, Wisconsin, Pennsylvania, and California.

32. On May 12, 2025, LT Brown was again contacted by the owner of Jug Grips who advised two more envelopes had been returned to the business that were found to contain suspected drugs. One envelope was addressed to a person in Maryland and another to New York. Both envelopes contained a crystal substance that field tested positive for the presence of methamphetamine. The USPIS Forensic Laboratory confirmed the substance mailed to Maryland was d-methamphetamine hydrochloride with 98% purity. The USPIS Forensic Laboratory also located multiple latent fingerprints that belonged to Pachomow on the exterior of this envelope. The USPIS Forensic Laboratory confirmed the substance mailed to New York was d-methamphetamine hydrochloride with 99% purity.

33. On May 15, 2025, LT Brown was again contacted by the owner of Jug Grips who advised two more envelopes had been returned to the business that were suspected to contain drugs. One envelope was addressed to a person in Minnesota and the other was mailed to Colorado. One of the envelopes was heavily damaged and did not contain anything. The envelope mailed to Minnesota was found to contain two plastic bags. One contained eight M30 fentanyl pills and the second contained one white pill.

34. On May 19, 2025, LT Brown was contacted by the owner of Jug Grips who advised two more envelopes had been returned to the business suspected to contain drugs. One envelope was addressed to a person in New Mexico and the second envelope's recipient address was covered

17

with a "Return to Sender for Postage" sticker. Both envelopes were found to contain plastic bags with white pills.

35. On May 19, 2025, I traveled to the Lakeview Post Office and conducted a review of mail dropped off on this date. Upon doing so, I located sixteen envelopes and one USPS ground advantage package. All were addressed from Jug Grips as with the previous parcels. The packages were mailed to Kentucky, West Virginia, Illinois, Colorado, Texas, Massachusetts, Arkansas, Pennsylvania, New York, California, Kansas, Indiana, and Maryland.

36. On May 28, 2025, LT Brown was contacted by the owner of Jug Grips who advised six more envelopes had been returned to his business that were found to contain suspected drugs. All six envelopes reflected that the sender was Jug Grips, 35 Highland View Drive, Southern Pines, NC 28387. The envelopes were mailed to California, Georgia, New York, Montana, and Colorado. Two of the envelopes mailed to California contained white pills, an envelope mailed to Georgia contained suspected methamphetamine and M30 fentanyl pills, one envelope mailed to New York contained suspected methamphetamine, one envelope mailed to Montana contained white pills and suspected M30 fentanyl pills, and the envelope mailed to Colorado contained suspected MDMA.

37. On June 4, 2025, LT Brown was again contacted by the owner of Jug Grips who advised one more envelope had been returned to his business that was found to contain suspected drugs. This envelope was mailed to an address in Montana. The envelope was found to contain approximately six grams of M30 fentanyl pills.

38. On July 3, 2025, LT Brown was again contacted by the owner of Jug Grips who advised one envelope had ben returned to his business that was found to contain suspected drugs. This envelope was mailed to an address in Colorado. The envelope was found to contain a plastic bag with white pills.

39. On July 7, 2025, LT Brown was again contacted by the owner of Jug Grips who advised one more envelope had been returned to his business that was found to contain suspected drugs. This envelope was mailed to an address in North Dakota. The envelope was found to contain a substance which field tested positive as amphetamine.

40. In July 2025, members of the MCSO were conducting surveillance of the **Target Location**. While conducting surveillance, Pachomow was observed in an outbuilding on the property, located directly behind the **Target Location**.

41. Based on my training and experience and that of my team, I know that controlling a drug trafficking operation generates a substantial amount of documents and records through its day-to-day operations. As described more fully below, the investigation to date has revealed that this would generate substantial records and documents that are likely to be kept inside the **Target Location**.

42. As previously documented in this affidavit, many envelopes and parcels suspected and confirmed to contain narcotics have been identified throughout the course of this investigation. I know through my training and experience in executing search warrants on locations used to receive and store packages that contain narcotics and/or the proceeds of narcotics sales, that packages, packaging materials, receipts, mailing labels, and related shipping products often remain within the residence and surrounding property.

43. Based on the above, and the training and experience of the investigative team, drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, receipts for telephone purchase/service; cellular telephones; computers capable of e-mail communication; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing

association in fact with persons known to traffic in controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

44. Thus, it is highly likely that wireless phones, computers, and/or digital devices which will be inside the **Target Location** and will contain evidence of drug distribution involving Janusz Pachomow and the **Target Location**.

## VI. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only records and other documents, but also electronically stored information on wireless telephones or tablets found at the **Target Location**. The electronically stored information might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how those devices were used, the purpose of their use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on these devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy"

20

while executing a search warrant at a residence.

     c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

     d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of cellular telephones and computers found on the premises of the **Target Location** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of these devices to human inspection in order to determine whether it is evidence described by the warrant.

## VII.   CONCLUSION

48. Based upon the preceding information, I believe Janusz Pachomow, and others are conspiring to distribute and actually distributing fentanyl, methamphetamine, MDMA, and

ketamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, Title 21 United States Code Section 856 (maintaining a drug involved premises), and Title 21, United States Code, Sections 960(a) (1) and 963 (attempted importation of a controlled substance).

49. I further believe that the **Target Location** is a stash house utilized by Pachomow to plan transactions and store fentanyl, methamphetamine, MDMA, and ketamine. Accordingly, my team and I believe that wireless telephones, computers, tablets, drug proceeds, postal records, and/or documents

evidencing participation in drug trafficking and the laundering of drug proceeds will be found at the **Target Location**.

/s/ Jordan Wicks_____
Jordan Wicks
Inspector
U.S. Postal Inspection Service

August ___11___, 2025

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

22

## ATTACHMENT A

### *Target Location*

The premises located at **146 Split Rail Road, Carthage, North Carolina 28327 (Target Location),** to include all outbuildings and a gray 2007 Pontiac, NC License Plate: TPT9437 located on the property at the time of execution. The **Target Location** is modular home located on a grey foundation. The **Target Location** has light colored siding with dark colored shutters and a covered wood porch. The front door of the residence faces to the approximate southwest and the numbers "146" are clearly posted on the porch.. A photograph of the **Target Location** building is included herein.



## ATTACHMENT B

*Property to be seized*

All objects, records, and information relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances, possession with the intent to distribute controlled substances, and conspiracy to do the same), Title 21 United States Code Section 856 (maintaining a drug involved premises), and Title 21, United States Code, Sections 960(a) (1) and 963 (attempted importation of a controlled substance) that constitute evidence of a crime, contraband, fruits of crime, other items illegally possessed, or items intended for use or used in committing a crime, and other instrumentalities of those violations, in the form of:

1. Controlled substances, paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

2. Indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records referencing or revealing the ordering, purchase or possession of controlled substances and/or the laundering of money;

3. U.S. currency and other illicit gains from the distribution of controlled substances;

4. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

5. Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances and/or money laundering;

6. Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, and strong boxes;

7.     Photographs of controlled substances and/or firearms and photographs of individuals possessing controlled substances and/or firearms and photographs showing the association of individuals;

8.     Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

9.     Safes or secured storage containers that could hold narcotics, currency, firearms, or financial paperwork;

10.    Firearms, firearm accessories, ammunition, documents and packaging associated with firearms that may be used or possessed in furtherance of drug trafficking.

11.    Cellular telephones and computers, including the digital devices internal memory and attached data memory cards, located at the premises at the time the warrant is executed, except that cellular telephones may be seized but a separate warrant will be required to search.

Case 1:25-mj-00315-JEP     Document 1     Filed 08/11/25     Page 26 of 26